## COMPLAINT
# EXHIBIT A

**[Execution Copy]**

## SOFTWARE LICENSE AGREEMENT

This Software License Agreement is made this 31st day of March, 2004 ("the Effective Date"), by and between Natural Health Trends Corp., a Florida corporation, ("NHTC"), MV MergerCo, Inc., a Delaware Corporation (hereinafter "MergerCo"), and MarketVision Consulting Group, LLC, a Delaware LLC having a registered address of 9 East Loockerman Street, Suite 1B, Dover, Kent County, Delaware 19901, ("Licensee").

### BACKGROUND

Under that certain Agreement and Plan of Merger dated March 31, 2004 (as the same may be modified, amended, supplemented and/or restated from time to time, the "Merger Agreement"), among Natural Health Trends Corp., MV MergerCo, Inc., and MarketVision Communications Corporation ("MVCC"), the MarketVision Software (as defined in the Merger Agreement) developed and owned by MVCC became owned by MergerCo.

This is the MarketVision Software License Agreement referred to (and defined as such) in the Merger Agreement. It is a condition precedent to the consummation of the transactions contemplated by the Merger Agreement that NHTC and MergerCo execute and deliver this Agreement.

Now, therefore, in consideration of the premises and mutual covenants and undertakings herein contained and of each and every act performed or to be performed hereunder, NHTC, MergerCo, and Licensee hereby agree and covenant as follows:

1. **Definitions.**

    **1.1** <u>Software</u>: means the MarketVision Software in executable and machine-interpretable form, and any updates and enhancements thereto made by or for any party to this Agreement.

    **1.2** <u>Documentation</u>: means, with respect to a software program of the Software, the source code, if applicable (with comments as may exist), as well as any pertinent commentary or explanation prepared by or for, or that is the property of, the owner, developer, author, or maintainer, including without limitation all notes, flow charts, programmer's and user's manuals.

    **1.3** <u>Intellectual Property Rights</u>: means patent rights (including patent applications and disclosures), copyrights (including, but not limited to, rights in audiovisual works), trademark rights (including but not limited to trademarks, whether registered or not), trade secret rights, rights of priority and any other intellectual property right recognized in any country or jurisdiction in the world.

    **1.4** <u>Trademark</u>: means the service mark and trademark MARKETVISION in the goods and services of the development, distribution, and maintenance of the Software.

**1.5**   Other Definitions:   Capitalized terms not otherwise expressly defined in this Agreement shall have the meanings set forth in the Merger Agreement.

**2.**   **License.**   Subject to the terms and conditions of this Agreement, MergerCo grants to Licensee an irrevocable, exclusive, perpetual, royalty-free, fully-paid, worldwide, transferable, sublicensable right and license to use, copy, modify, distribute, rent, lease, enhance, transfer, market, and create derivative works of the Software and Documentation, and to sue for infringement of the Software and Documentation for its own account and without right of accounting to Licensor.   MergerCo further grants to Licensee an irrevocable, exclusive, perpetual, royalty-free, fully-paid, worldwide, transferable, sublicensable right and license to use the Trademark in connection with its development, distribution, and maintenance of the Software and Documentation.

**3.**   **Limited Rights.**   Notwithstanding the foregoing, Licensee agrees that during the period commencing on the date hereof and ending on the date upon which an Event of Default occurs, (i) subject to Licensor's compliance with Section 6 below, Licensee agrees to waive its right to exclusivity granted under Section 2 above, and to waive its rights to sublicense, distribute, rent, lease, transfer, market, and sue for infringement of, the Software and Documentation, in order to enable Licensor to use the Software and Documentation, and to grant such restricted licenses to the Software and Documentation to third parties as are permitted herein.   Following the occurrence of an Event of Default, (a) each and every element of Licensee's waiver under this Section 3 of exclusivity and of rights shall terminate, and (b) Licensee may exercise and exploit every right granted to it under Section 2 above, such rights to be exclusive except as subject to MergerCo's retention of a limited right to use the Software and Documentation for Licensor's (Licensor's affilate's, or other permitted owner's) internal use only and not as an application service provider or service bureau, and (ii) MergerCo shall not rent, lease, license, transfer or distribute the Software or the Documentation without the prior written consent of Licensee; provided however, that NHTC, MergerCo or any of their affiliates or joint ventures may transfer the ownership of the Software to any third party in connection with a sale of all, or substantially all, of the assets of such entity, subject in each case to Licensee's rights, and the acquiring party's assumption of all obligations, under this Agreement.

**4.**   **Proprietary Rights.**   All right, title, interest, ownership and proprietary rights in and to the Software and Documentation (including derivative works, enhancements, corrections, or improvements made by Licensee, but only such made prior to an Event of Default) shall remain in MergerCo, NHTC, or any affiliate thereof, as the case may be, subject in each case to Licensee's rights under this Agreement.   MergerCo's rights under this Section 4 will include all Intellectual Property Rights in the Software and Documentation, but shall exclude any Intellectual Property Rights in any derivative works, enhancements, corrections, or improvements that Licensee may create following the occurrence of an Event of Default.

**5.**   **Maintenance.**   During the term of this Agreement, MergerCo and/or NHTC, any affilate thereof or other permitted owner of the Software and Documentation will, upon written request from Licensee from time to time, provide Licensee the following materials and standard maintenance services for the Software through electronic download, electronic mail transmission, or physical delivery: (i) the Software and Documentation as they exist as of the

date of this Agreement; (ii) corrections of substantial defects in the Software; and (iii) periodic updates of the Software that may incorporate (a) corrections of any Software defects, (b) fixes of any Software bugs, and (c) any enhancements to the Software, created, designed, or implemented by MergerCo, NHTC, and/or their employees, contractors, and agents.   Standard maintenance services do not include: (i) custom programming services; (ii) on-site support; or (iii) hardware and related supplies.

6.   **Restrictions on Licensing of Software by Licensor.**   During the period (the "Restricted Period") commencing on the date hereof and ending on the earlier of (a) the occurrence of an Event of Default (as hereinafter defined), or (b) the date on which an Event of Default can no longer occur (because the Promissory Notes have been paid in full and a Share Default (as hereinafter defined) is incapable of occurring (due to the price threshold having been satisfied), Licensor shall not license the Software or the Documentation to any third parties or allow any third parties to use the Software unless (x) such license or use is pursuant to a written agreement for use of the Software solely on an application service provider basis with services to be provided by Licensor ("Third-Party License"); (y) such Third-Party License is expressly assignable by Licensor to Licensee following an Event of Default without the consent of the third-party licensee; and (z) other than such client modules as are necessary for the third-parties' use of the Software, a copy of the Software is not made available nor delivered to such third-party licensee; provided however, that the Licensor may deliver to a reputable escrow agent a copy of the Software source code (and updates thereto) pursuant to a customary source code escrow agreement that provides, inter alia, that the third party licensee's rights to use the Software upon a release event are limited to such use necessary for the third-party licensee to exercise its license rights under the Third-Party License.

7.   **Engagement of Licensee and Assignment of Licenses.**   Following an Event of Default: (i) Licensee shall perform application service provider services (in a manner consistent with the services provided by MVCC prior to the date hereof) featuring the Software to Licensor, if elected by Licensor; (ii) thereafter Licensor shall pay Licensee until all obligations due and payable under the Promissory Notes have been paid in full (a) $36 for each newly signed distributor of Licensor, MergerCo, NHTC, or any affiliate thereof, if the total outstanding obligations under the Promissory Notes exceeds $500,000, and (b) $18 for each newly signed distributor of Licensor, MergerCo, NHTC, or any affiliate thereof, if the total outstanding obligations under the Promissory Notes is equal to or less than $500,000; (iii) Licensor shall assign to Licensee all of Licensor's rights and obligations under any licenses or application service provider agreements pertaining to the Software and elected by Licensee, entered into by Licensor with third parties; and (iv) any waiver of, or restriction on, Licensee's rights under Section 2 herein shall terminate.

8.   **Disclaimers.   MERGERCO AND NHTC MAKE NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**THE SOFTWARE PROVIDED UNDER THIS AGREEMENT IS "AS IS".**

**9.     Term and Termination.** This Agreement becomes effective as of the Effective Date and will terminate on March 31, 2008; provided however, if an Event of Default has occurred prior to such termination date, this Agreement shall continue until terminated in writing by Licensee.

**10.     Event of Default.**     Each and any of the following events shall comprise an Event of Default under this Agreement:

**10.1**     The Issuer under the any Promissory Note fails to make a payment when due and that failure is not cured within 30 days after written notice from any of the holders thereof or their agent;

**10.2**     The Licensor defaults on any payments due under the Employment Agreements, as defined in the Merger Agreement, between Licensor and a member of the Licensee; or

**10.3**     A "Share Default" occurs, defined as the Market Value per share of the NHTC Common Stock failing to equal or exceed $10.00 per share for any one (1) rolling period of six (6) consecutive months during the three-year period commencing on the earlier of (i) the first anniversary of the date of this Agreement, or (ii) the date on which the Merger Shares are registered with the Securities and Exchange Commission for resale to the public.

**11.     Confidentiality.** Confidential Information shall include the Software, Documentation, the terms under this Agreement, and all information clearly identified as confidential. During the Restricted Period, Licensee shall hold all Confidential Information in confidence, and shall take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by its employees or agents to third parties not subject in writing to the confidentiality obligations in this Section. MergerCo and NHTC shall hold all Confidential Information in confidence, and shall take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by their respective employees or agents except to permitted third parties that are subject in writing to the confidentiality obligations in this Section.

**12.     General Provisions.**

**12.1     Independent Contractor Relationship.** The relationship between MergerCo and Licensee established by this Agreement is that of independent contractors.     No franchise, joint venture or partnership is established by this Agreement.     Neither party is the agent, broker, partner, employee, or legal representative of the other for any purpose.

**12.2     Assignment.** Neither party will have the right to assign this Agreement in whole or in part without written approval of the other party, which approval will not be unreasonably withheld or delayed.  However, either party may assign this Agreement without such consent in connection with a merger, acquisition, corporate reorganization or sale of all or substantially all of its assets, unless such transaction would result in an assignment to an entity reasonably deemed to be a direct competitor of the other party. This Agreement will inure to the benefit of, and will be binding upon, the parties and their successors and permitted assigns.

**12.3   Notices.**  All notices under this Agreement must be in writing and sent to the address of the receiving party specified below, via hand delivery, United States registered or certified mail, return receipt requested, or recognized overnight courier service.  Notice shall be effective upon receipt if hand delivered or if delivered by overnight courier, or three (3) days after posting if deposited in U.S. mail.  The parties may change their notice address by giving notice in accordance with this Section.

**12.4   Agents and Subcontractors.**  MergerCo may use third parties under contract with MergerCo to assist MergerCo in the performance of its obligations under this Agreement, provided that MergerCo will remain responsible for all its obligations under this Agreement whether or not such third parties so assist MergerCo.

**12.5   Jurisdiction and Venue.**  This Agreement and any dispute arising from or relating to the performance or breach hereof shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without reference to conflicts of laws principles.  The parties irrevocably agree to the exclusive jurisdiction of the federal or state courts located in Delaware.

**12.6   Force Majeure.**  Nonperformance by either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, earthquake, governmental acts or orders or restrictions, or any other reason when failure to perform is beyond the reasonable control of the nonperforming party.

**12.7   No Waiver.**  The waiver by either party of a breach of any provision of this Agreement or the failure by either party to exercise any right hereunder shall not operate or be construed as a waiver of any subsequent breach or as a waiver of any other right.

**12.8   Severability.**  If any provision of this Agreement is held to be unenforceable for any reason, it will be modified rather than voided, if possible, in order to achieve the intent of the parties to this Agreement to the extent possible. Any provision held overbroad as written will be deemed amended to narrow its application to the extent necessary to make the provision enforceable under applicable law, and enforced as amended. In any event, all other provisions of this Agreement will be deemed valid and enforceable to the full extent.

**12.9   Complete Agreement.**  This Agreement and any Exhibits constitute the complete agreement between the parties and supercede all prior or contemporaneous agreements or representations, written or oral, concerning the subject matter of this Agreement.  This Agreement may not be modified or amended except in writing signed by a duly authorized representative of each party; no other act, document, usage or custom shall be deemed to amend or modify this Agreement.  This Agreement shall also supersede all terms of any unsigned, "shrinkwrap," or "clickwrap" license that may be included in any package, media, or electronic version of the Software or Documentation to the extent inconsistent with this Agreement.

**12.10   Bankruptcy.**  The parties acknowledge, intend, and agree that the rights granted to Licensee under this Agreement, excluding the trademark rights and Trademark, are grants of intellectual property for which the Licensee is entitled to the protections of 11 U.S.C. s. 365(n).

AGREED TO:

MV MergerCo, Inc.:

Signature: _____

Name: Mark D. Woodburn

Title: CFO and Secretary

Address: _____

_____

MarketVision Consulting Group, LLC:

Signature: _____

Name: John Cavanaugh

Title: _____

Address: _____

_____

Natural Health Trends Corp.

Signature: _____

Name: Mark D. Woodburn

Title: President and Chief Financial Officer

Address: _____

_____

AGREED TO:

MV MergerCo, Inc.:

Signature:_____

Name: Mark D. Woodburn_____

Title: CFO and Secretary_____

Address: _____

_____

MarketVision Consulting Group, LLC:

Signature:_____

Name: John Cavanaugh_____

Title: _____

Address:      _____

_____

Natural Health Trends Corp.

Signature: _____

Name: Mark D. Woodburn_____

Title:  President and Chief Financial Officer

Address: _____

_____

# COMPLAINT
# EXHIBIT B

# GOING-FORWARD AGREEMENT

This Going Forward Agreement dated as of December 1, 2008 (the "Effective Date") , is by and among Natural Health Trends Corp. ("NHTC"), Market Vision Communications Corp. ("MVCC"), MarketVision Consulting Group, LLC ("MVCG"), John Cavanaugh ("Cavanaugh") and Jason Landry ("Landry").

RECITALS:

A.      Cavanaugh and Landry were owners of a company that developed certain software. In 2004, that company merged into MVCC, a wholly-owned subsidiary of NHTC.  In connection with the merger, a Software License Agreement (the "Software License Agreement"), dated March 31, 2004, was entered into by NHTC, MVCC and MVCG.

B.      Cavanaugh and Landry are employees of MVCC pursuant to separate employment agreements dated December 8, 2006 with NHTC and MVCC (the "Employment Agreements").

C.      The parties hereto desire to establish certain terms to govern their relationship going-forward.

AGREEMENT:

In consideration of the premises stated in the Recitals which are hereby incorporated into this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto each agree to be legally bound by the terms in this Agreement.

1.  Going-Forward Terms.  The terms of this Agreement are intended to clarify certain existing rights and obligations of the parties hereto and to create and modify other relationships of such parties.  Items may be included within this Agreement merely to confirm the parties' respective rights and obligations but the fact that such provisions are proposed or included in this Agreement is not to be interpreted or construed to indicate that the parties rights and obligations would be different if this Agreement did not exist.  **The parties acknowledge that this Agreement is proposed as an offer in an attempt to resolve actual or potential disputes and is governed by Rule 408 of the Federal Rules of Evidence.  Without limiting the foregoing, this Agreement and the terms proposed herein shall not have any evidentiary value and shall be entirely disregarded unless this Agreement is executed by all parties hereto.**

2.  Software License Agreement.   An Event of Default occurred under the Software License Agreement on January 1, 2007.

2.1     Software Service Provider Agreements.  MVCC provides application service provider ("ASP") services using the "Software" (as defined in the Software License Agreement) to bHIP Global, Inc. ("bGI") pursuant to that certain Service Bureau and Hosting Agreement dated as of September 18, 2007, between MVCC and bGI (the "bGI ASP Agreement"), a true and complete copy of which is attached as **Exhibit 2.1**.  MVCC has provided bGI notice that it intends to discontinue such services to bGI on December 1, 2008. On the Effective Date, (i) MVCC hereby assigns the bGI ASP Agreement pertaining to the Software to MVCG; and (ii) MVCG hereby assumes MVCC's obligations under the bGI

4422026

ASP Agreement (excluding obligations arising from MVCC breaches relating to periods prior to the Effective Date). Fees incurred by bGI under the bGI ASP Agreement prior to September 1, 2008 (whether or not invoiced to bGI) remain the property of MVCC. Fees incurred by bGI under the bGI ASP Agreement on and after September 1, 2008 shall be the property of MVCG. MVCG will perform the current services to be performed under the bGI ASP Agreement up to November 30, 2008 in exchange for amounts due from bGI under the bGI Asp Agreement since September 1, 2008. NHTC will send an invoice to bGI for September, October and November 2008 and direct bGI to pay those invoices to MVCG. Any such amounts already received by NHTC shall be remitted to MVCG on the Effective Date and any such future amounts received will be remitted to MVCG within two (2) business days after receipt.

2.2     Section 7(i) and 7(ii).   Sections 7(i) and 7(ii) of the Software License Agreement are void and without further force or effect. Cavanaugh, Landry and MVCG acknowledge and agree that MVCC owns the MarketVision Software and Documentation (as defined in the Software License Agreement), subject to the rights of MVCG under the Software License Agreement, and that MVCC and NHTC continue to have all rights necessary to continue to use the Software and Documentation (as defined in the Software License Agreement) for the internal use of MVCC and NHTC and their affiliates. This right of internal use includes the right to copy, modify, enhance, and create derivative works, but does not include the right to use the Software or Documentation (or copies, modification, enhancements, or derivative works) as an application service provider or service bureau or to rent, lease, license, transfer or distribute the Software or Documentation (except as expressly provided in the Software License Agreement and that certain letter agreement dated as of December 1, 2005, by and among NHTC, MVCC, and MVCG regarding the MarketVision Software License Agreement).

2.3     Section 5.   The obligations under Section 5 of the Software License Agreement for MVCG to be provided corrections and periodic updates (corrections, fixes and enhancements) shall be limited to once at the beginning of each calendar quarter unless such corrections or periodic updates address a security vulnerability in which case they will be disclosed to MVCG when identified and provided to MVCG when available without requirement that MVCG make a written request therefor. Corrections and update will be provided via electronic transfer of the entire object code operating the Software and physical transfer of related source code except as otherwise agreed in writing by MVCC and MVCG. MVCC and NHTC acknowledge and agree that, as of the Effective Date, MVCG shall be given a complete copy of the Software and Documentation (as such terms are defined in the Software License Agreement (including source code) then being used by MVCC, including all developments and enhancements through the Effective Date, and other materials used or useful in the operation, maintenance and enhancement of the same for use thereof under MVCG's software license granted in the Software License Agreement. The parties hereto agree that MVCC and NHTC will continue to possess the current live, demo and development Software used by MVCC and NHTC and the original (or a copy, if no original is available) of the Documentation will remain with or at MVCC and NHTC. MVCG will receive copies of the Software and Documentation.

3.   Transition Services Agreement.  MVCG, Cavanaugh and Landry agree that MVCG will provide NHTC and MVCC the transition services identified in the Transition Services Agreement

4422026

attached as **Exhibit A** hereto in exchange for the consideration stated therein (the "Transition Services Agreement").

4. <u>Employment Agreements</u>. The "Term" (as such word is defined in each of the respective Employment Agreements of Cavanaugh and Landry with NHTC and MVCC) is amended to expire as of the Effective Date. Sections 5, 6 and 7 of the Non-Competition Agreements of Cavanaugh and Landry (as referenced in their respective Employment Agreements) are void. Cavanaugh and Landry hereby resign from any and all positions of any capacity with NHTC and any of its subsidiaries (including MVCC), including, without limitation, as an employee, officer and director. The post-employment cooperation provisions in Section 9.13 of the respective Employment Agreements of Cavanaugh and Landry are terminated in lieu of the services to be provided pursuant to the Transition Services Agreement.

5. <u>Restricted Stock</u>. The restricted stock granted by NHTC to each of Cavanaugh, Landry, David Liu, Jay Johnson, and Ivan Gamanyuk shall continue to vest according to the terms of the restricted stock agreements during the term of the Transition Services Agreement (without the termination of their employment having any effect). Further, unvested shares shall vest and be deemed to be nonforfeitable (100% vested) on the expiration of the Transition Services Agreement or termination of the Transition Services Agreement for Cause by MVCG or without Cause by NHTC (but any unvested shares shall be forfeited upon termination for Cause by NHTC). Cavanaugh and Landry agree not to sell or transfer any restricted stock vesting after the date of this Agreement (other than the restricted stock granted on or about June 26, 2007, as part of an exchange of restricted stock for options) until one year after the end of the Transition Services Agreement. The continued vesting of such restricted stock for David Liu, Jay Johnson, and Ivan Gamanyuk is subject to such person making himself available to MVCG to provide services under the Transition Services Agreement and, at the request of NHTC, such person agreeing not to sell or transfer any restricted stock vesting after the date of this Agreement until one year after the end of the Transition Services Agreement.

6. <u>Transfer of Domain Names</u>. NHTC and MVCC hereby transfer to MVCG the domain names "marketvision.com" and "marketvision.net" and all goodwill and other rights associated therewith. NHTC and MVCC represent that they have not transferred their interests in such domain names and other rights to any other party. NHTC and MVCC agree that they (a) will not continue to use such domain names or externally use content associated with such domain names, other than proper disclosure required by governments, auditors, courts of laws or any other regulatory authorities, or confusingly similar domain names, (b) will on the Effective Date transfer, and promptly thereafter execute such documents reasonably requested by MVCG as may be further necessary or appropriate to effect the transfer and hereby grant MVCG the right to take such action and execute such documents in its own name or on behalf of NHTC and/or MVCC to effect the transfers. Upon transfer of the domain names, MVCG will transfer hosting of these domains from MVCC servers to servers owned by MVCG. In addition, MVCC employees will begin using e-mail addresses at the "nhtglobal.com" domain and their e-mail addresses at the "marketvision.com" or "marketvision.net" domains will be forwarded to their e-mail addresses at the "nhtglobal.com" domain for a period of six months. NHTC and MVCC hereby transfer any and all rights they have in and to the name "marketvision" and derivations thereof (including without limitation existing goodwill and infringement rights, actions and claims for damages related thereto), and they represent and warrant that they have not previously transferred any such rights to anyone else.

4422026

7.  <u>Release</u>.

(a)     Except with respect to express obligations arising under this Agreement, NHTC and its subsidiaries (including MVCC), on behalf of themselves and all others claiming by, through or under them ("<u>NHT</u> Releasors"), hereby fully and irrevocably release MVCG, Cavanaugh and Landry, individually and collectively, in any and all capacities as well as their successors and assigns ("<u>MV</u> Releasees"), from any and all claims, demands, liability, obligations or causes of action (collectively "<u>Claims</u>") of any kind, nature or description whether arising in law or equity, which any of the NHT Releasors have had, now have or may hereafter have, against any of the MV Releasees for or by reason of any act, omission, matter, cause or thing whatsoever occurring from the beginning of time through and including the date of this Agreement (but not after the date of this Agreement), whether such Claims are matured or unmatured, known or unknown, including, without limitation, matters related to the existing litigation initiated by NHTC against bHIP Global, Inc. and Terry LaCore and any other all matters arising in connection with or involving bHIP Global, Inc. or Terry LaCore.  Further, NHT Releasors covenant not to sue or bring (or assist, encourage, or finance the bringing by any person not a party to this Agreement) any Claims against the MV Releasees related to the subject of the foregoing release and NHT Releasors agree to indemnify and hold MV Releasees harmless from any and all Claims (including, without limitation, reasonable attorneys' fees and other costs and expenses) which MV Releasees suffer or incur within the scope of the foregoing release.

(b)     Except with respect to express obligations arising under this Agreement, MVCG, Cavanaugh and Landry, individually and collectively, on behalf of themselves and all others claiming by, through or under them ("MV <u>Releasors</u>"), hereby fully and irrevocably release NHTC and its subsidiaries (including without limitation MVCC), and their officers and directors in any and all capacities, and employees, agents and representatives of NHTC and its subsidiaries when acting in such capacity, as well as their successors and assigns ("<u>NHT</u> Releasees"), from any and all Claims of any kind, nature or description whether occurring in law or equity, which any of the MV Releasors have had, now have or may hereafter have, against any of the NHT Releasees for or by reason of any act, omission, matter, cause or thing whatsoever occurring from the beginning of time through the date of this Agreement (but not after the date of this Agreement), whether such Claims are matured or unmatured, known or unknown, including, without limitation, matters related to the existing litigation initiated by NHTC against bHIP Global, Inc. and Terry LaCore and any other all matters arising in connection with or involving bHIP Global, Inc. or Terry LaCore.  Further, MV Releasors covenant not to sue or bring (or assist, encourage, or finance the bringing by any person not a party to this Agreement) any Claims against the NHT Releasees related to the subject of the foregoing release and MV Releasors agree to indemnify and hold NHT Releasees harmless from any and all Claims (including, without limitation, reasonable attorneys' fees and other costs and expenses) which NHT Releasees suffer or incur within the scope of the foregoing release.  MV Releasors individually and collectively agree not to aid or assist any person, including without limitation bHIP Global, Inc. and Terry LaCore, in preparing, filing, planning, or pursuing any litigation, arbitration or other legal proceedings against the NHT Releasees, except in response to a subpoena order from a court of competent jurisdiction or other legal requirement. Notwithstanding anything to the contrary, excluded from the foregoing release (and associated indemnity and covenant not to sue) are (i) "Employee Rights" (as defined below), (ii) all matters related to the obligation of the NHT Releasees under the Software Agreement, and (iii) any rights to indemnification and advancement of legal fees and other defense costs under the Certificates of Incorporation and Bylaws of NHT and MVCC, and applicable law, as well as any rights to

4422026

make claims under any insurance policy (including without limitation any D&O policy). Further, NHTC agrees to advance funds to MVCG Releasors to cover the reasonable costs, expenses, disbursements, and attorneys' fees with respect to claims relating to or resulting from the acts and omissions (or alleged acts and omissions) of Cavanaugh and Landry as employees, officers and directors of the NHT Releasors (as applicable), except to the extent precluded by law, upon receipt of a written undertaking by or on behalf of such indemnitee to repay such amount if it shall ultimately be determined that indemnitee is not entitled to indemnification as provided in this Agreement. Landry shall be entitled to indemnity expense advancements and indemnity on the same basis as if he was an officer of NHTC and MVCC. True and complete copies of the Certificates of Incorporation and Bylaws of NHTC and  MVCC are attached hereto as **Exhibit 7(b)**.

"Employee Rights" are claims for unpaid final compensation amounts (including vacation pay and the like payable upon termination but excluding severance), expense reimbursements and other employee benefits (e.g., reimbursement from medical spending (flex fund) accounts, claims for vested post-termination benefits under any pension, 401(k) or similar retirement benefit plan; and COBRA rights), and any bonus or similar payment right that is or becomes payable (pro rated for the partial period employee was employed) without application of any requirement that employee remain employed in order to be eligible to receive such amount. Employee Rights for Cavanaugh also include the 3% salary increase provided for in his Employment Agreement commencing on January 1, 2008 which has not been paid and shall be paid in the final, termination of employment, wage payment to Cavanaugh. NHTC/MVCC also agree to pay, on the Effective Date, the following invoices associated with legal work NHTC/MVCC requested MVCG to secure on behalf of NHTC/MVCC by delivering payment to MVCG for remittance to the vendor:

    -- Fredrikson & Byron - Invoice 1003131 – Extension of Default - $5,676.00

    -- Fredrikson & Byron – Invoice 1003129 – Transfer of Assets - $4,280.50
                                                          (outstanding balance)

    -- Fredrikson & Byron – Invoice 1010172 – General - $4,210.00

    -- Fredrikson & Byron – Invoice 1006479 – General - $630.00

8.    <u>Return of Confidential Information</u>.

    (a)    Pursuant to Section 1 of the Non-Competition Agreements, Cavanaugh and Landry shall immediately cease use of and keep confidential all information of NHTC or MVCC, or of a third party with which NHTC or MVCC has a business relationship, relating to the current or prospective business, research and development activities, products, technology, strategy, organization and/or finances of NHTC, MVCC or such third party (collectively, "Confidential Information"). Such Confidential Information, which may be disclosed orally or in writing, shall include, without limitation, Technology (as defined in Section 2(a) of the Non-Competition Agreements), Work Product (as defined in Section 2(a) of the Non-Competition Agreements), plans, strategies, negotiations, customer or prospect identities, market analyses, projections, forecasts, cost and performance data, sales data, financial statements, price lists, pre-release information regarding NHTC's or MVCC's products, personnel lists and data, and all documents and other materials (including any notes, drawings, reports, manuals, notebooks, summaries, extracts or analyses), whether in written or electronic form, that disclose or embody such Confidential Information.

    (b)    Pursuant to Sections 1 and 4 of the Non-Competition Agreements, Cavanaugh and Landry shall immediately return to NHTC and MVCC all tangible and electronic material that disclose or embody Confidential Information, as well as all documents, records, apparatus,

4422026

equipment and other physical property, whether or not pertaining to Confidential Information, previously furnished to them by NHTC or MVCC or produced by them in connection with their services to NHTC and MVCC.

(c)     Notwithstanding anything to the contrary in the foregoing, MVCG, Cavanaugh and Landry may retain and use a copy of information and materials necessary or useful in the operation of the Software delivered to MVCG under Section 2.3 and contact information for the purpose of proposing, offering and providing computer-programming or application server provider services to any person and for maintaining personal relationships, but will otherwise hold contact information which is Confidential Information (as defined in the Non-Competition Agreements) in confidence, not disclose it to any person other than MVCG employees who need and use it to propose, offer or provide services, and will not use it to directly or indirectly recruit or solicit any employees, distributors or vendors of NHTC for any other person.

(d)     For clarity and avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the foregoing restriction applicable to Confidential Information is not applicable to and does not restrict use of service providers and advisors (e.g., financial services, compliance and fiscal advisors, network services, logistics, etc.) who are known as a result of the use or prospecting of such parties by NHTC/MVCC.

9.     General Provisions.  No purported amendment, modification or waiver of any provision hereof shall be binding unless set forth in a writing signed by both parties (in the case of amendments and modifications) or by the party to be charged thereby (in the case of waivers).  Any waiver shall be limited to the circumstance or event specifically referenced in the written waiver document and shall not be deemed a waiver of any other term of this Agreement or of the same circumstance or event upon any recurrence thereof.  The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  This Agreement shall be governed by and construed in accordance with the law of the State of Delaware without regard to the conflicts of laws and rules thereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement constitutes the entire Agreement between the parties and supersedes any and all prior and contemporaneous oral or written understandings between the parties relating to the subject matter hereof.  Copies of this Agreement with signatures transmitted electronically (e.g., by facsimile or pdf) shall be deemed to be original signed versions of this Agreement.

10.     Severability.  In the event that a provision of this Agreement is held invalid by a court of competent jurisdiction, the remaining provisions shall nonetheless be enforced in accordance with their terms.  Further, in the event that any provision is held to be overbroad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and shall be enforced as amended.  This Agreement shall not be construed against either party since each party has had the opportunity to negotiate its provisions and contribute to its drafting.

11.     Sublease.  NHTC/MVCC agree to sublease to MVCG, at no cost to MVCG, the premises which NHTC/MVCC leases under the Lease (including all amendments) dated March 9, 2005, by and between White Birch Aztec, LLC (or its successors or assigns) and MVCC (the "Lease"), a copy of which is attached as **Exhibit 11**.  The sublease shall extend for the remainder of

4422026

the Lease term and not be terminated early by NHTC/MVCC.  MVCG shall not conduct any business or take or permit any act that would constitute a breach by the Tenant under the Lease.  MVCG shall promptly report to NHTC any breaches under the Lease that do occur which it knows of with the exception of those caused by NHTC/MVCC or their agents.  NHTC/MVCC shall remain liable for the timely payment of all monetary payments due under the lease other than those which result from the misconduct of MVCG.  NHTC/MVCC shall seek reasonable agreements with the landlord and any other reasonably appropriate parties which provide for MVCG to receive notice and a right to cure any late payments of NHTC/MVCC relating to the leased premises.  MVCG may, but shall not be obligated to, cure any late payments of NHTC/MVCC relating to the leased premises and NHTC/MVCC shall be obligated to immediately reimburse MVCG for any such payments made by MVCG.

14.    **Late Payments**.  If the payments due from NHTC and/or MVCC under this Agreement (including, without limitation, payments due under Sections 2.3 and 11 above) are not timely made, MVCG shall be entitled to recover from NHTC and MVCC interest on the payments not timely made at a rate equal to 1.5% per month (or the highest rate permissible by law if less).  In addition, MVCG shall be entitled to recover from NHTC/MVCC collection and enforcement costs (including reasonable attorney's fees) incurred to enforce the terms of this Agreement.

13.    **Public Announcements**.  NHTC, MVCC and MVCG agree that no press release or other public statement or announcement, other than the required disclosure and filing by the Securities and Exchange Commission, with respect to the existence this Agreement or the transactions described herein (including the Transition Services Agreement) shall be made without the prior written consent of the other, which consent shall not be unreasonably withheld.  The parties shall cooperate to agree to a mutually agreeable announcement which satisfies any applicable securities law requirements.

14.    **Enforcement**.  In any action (at law or in equity) instituted to enforce or interpret the terms of this Agreement, the prevailing party (i.e., the party whose position is substantially upheld) shall be entitled to recover from the non-prevailing party all fees, costs and expenses of the prevailing party incurred with respect to such action, including but not limited to, fees, costs and expenses of attorneys, which shall include, without limitation, all fees, costs and expenses of appeals.  Further, the parties agree that any action to enforce or interpret the terms of this Agreement shall be exclusively resolved in state or federal court within Hennepin County, Minnesota, and each party consents to personal jurisdiction in such courts and waives any argument that the venue is not convenient.

15.    **Equitable Relief**.  Each of the parties acknowledges and agrees that it would be difficult to measure any damages caused due to a breach of this Agreement.  Accordingly, each of the parties separately agrees that upon a breach, or proposed or threatened breach, of any portion of this Agreement, the other parties shall be entitled, in addition to all other remedies, to equitable relief.

*[Signature page follows]*

4422026

The parties hereto have caused this Going-Forward Agreement to be effective as of the day and year first above written.

NATURAL HEALTH TRENDS CORP.        MARKET VISION COMMUNICATIONS CORP.

By _____            By _____
Its ___President___               Its ___Director___
Print Name ___Chris Sharng___     Print Name ___Chris Sharng___

MARKETVISION CONSULTING
GROUP, LLC

By _____
   John Cavanaugh, CEO

_____
John Cavanaugh                    _____
                                  Jason Landry

4422026

4422026

EXHIBIT A TO GOING-FORWARD AGREEMENT

<u>Transition Services Agreement</u>

      1.    <u>Transition Services</u>:  In accordance with the terms of this Transition Services Agreement (this "Agreement"), MVCG shall provide consulting services requested by NHTC with respect to the operation of the Software, as well as continued provision of the services provided by MVCG prior to the date of this Agreement, and transitioning of the Software and services to such employees of NHTC and its subsidiaries (including MVCC) as may be directed by NHTC. Consulting requests, directions, travel and work assignments under this Agreement will be determined and communicated solely by the President, Chief Financial Officer or Director of IT of NHTC ("NHTC Representatives"). Good faith efforts consistent with industry standards are to be used in providing the consulting services in a reasonably timely and efficient manner. The parties agree that Huey Guo has been given full unrestricted access, as well as both administrative and physical control, to the NHTC database, NHTC servers and NHTC project assignments on or prior to the execution of this Agreement and if something was omitted to give such access and control then the parties shall use good faith efforts to rectify the same.

      2.    <u>Time</u>:  During the initial six (6) month term of this Agreement, subject to NHTC timely paying all amounts due hereunder, each of NHTC and MVCG agree to participate at the request of the other in good faith discussions regarding entry into a maintenance agreement following expiration of the initial term of this Agreement.

      3.    <u>Travel</u>:  MVCG will provide the consulting services hereunder at the place or places reasonably requested by NHTC Representatives as necessary to accomplish the transition and make the consulting services effective. But neither Cavanaugh nor Landry will be required to provide services away from the Minneapolis, Minnesota area for more than 50% of each calendar month. Travel time (including one hour of travel preparation before a trip and one hour post-travel after returning) will be included in the number of hours of consulting services provided under this Agreement. Flight accommodations shall be business class or better on aggregate air travel of equal to or longer than three (3) hours. NHTC reserves the right to make the international travel arrangements.

      4.    <u>Compensation</u>:  NHTC will pay MVCG as set forth below during the initial term of six months of this Agreement. Other services may be provided on terms mutually agreed upon in writing by the parties.

          (a)    During the first three months of this Agreement, $65,000 per month for up to 30 hours per week by each of Cavanaugh and Landry and 20 hours per week for each of David Liu, Jay Johnson, and Ivan Gamanyuk, payable in installments of $32,500 on the last day of each two-week period of the first three months (subject to Section 5 below).

          (b)    During the second three months of this Agreement, $50,000 per month for up to 30 hours per week by each of Cavanaugh and Landry and 10 hours per week for each of David Liu, Jay Johnson, and Ivan Gamanyuk, payable in installments of $25,000 on the last day of each two-week period of the first three months (subject to Section 5 below).

          (c)    A one-time bonus of $15,000 shall be paid by NHTC/MVCC to MVCG within five (5) days after the following items are completed – NHTC/MVCC must cooperate to permit the completion of the following items:

    i.   John Cavanaugh provides Chris Sharng in a confidential file all user names, user identifications, passwords and pin numbers for all hardware, software and third-party services that are owned or leased by or for MVCC;

    ii.   Development commissions are run by JoAnn Dong in Minneapolis, MN;

    iii.   Live commissions are run by JoAnn Dong in Minneapolis, MN;

    iv.   Development commissions are run by JoAnn Dong in Dallas, TX;

    v.   Live commissions are run by JoAnn in Dallas, TX; and

    vi.   A simple, basic product is added to the live system by JoAnn Dong or Manny Fernandez in Dallas, TX.

(d)    $150 per hour for extra hours (with one hour minimum billing increments), as and when requested by NHTC Representatives, worked in excess of the above stated hours per week to be worked, provided that no person (Cavanaugh, Landry, Liu, Johnson or Gamanyuk are) is obligated to work more than 32 hours per week.

5.    <u>Hiring NHTC and MVCC Employees</u>:  NHTC will terminate the employment of David Liu, Jay Johnson, and Ivan Gamanyuk, and MVCG shall offer to employ David Liu, Jay Johnson, and Ivan Gamanyuk, immediately following execution of the Going-Forward Agreement and this Transition Agreement. MVCG's employment of these individuals is subject to Section 5(a) above. If any of David Liu, Jay Johnson or Ivan Gamanyuk do not accept or terminate employment with MVCC, then for each such person who does not accept or terminates employment with MVCC, the amount payable under Section 4(a) above will be reduced by $5,666 per month and the amount payable under Section 4(b) will be reduced by $2,833 per month. The monthly reduction in fees will begin from the day that employment is not accepted or terminated and, if terminated, will be pro rated on the basis of business days in the month employed versus business days in the month not employed by MVCG.

6.    <u>Billing</u>:  Every two weeks, MVCG shall provide to NHTC an invoice that contains a reasonably detailed description of the services provided hereunder, the dates on which the services were provided, the time spent by each person providing the services, the person providing the services, and the rate of the person providing each service. Payment will be made within ten (10) days of NHTC's receipt of each such invoice.

7.    <u>Expenses</u>:  All reasonable travel expenses (travel, meals and lodging) relating to travel requested by NHTC Representatives, as well as pre-approved business expenses, will be reimbursed within 10 days after NHTC's receipt of receipts and other documents reasonably substantiating the expenses in question.

8.    <u>Term</u>:

(a)    The initial term of this Agreement shall be 6 months from the date of this Agreement. For purposes of this Agreement, a "month" means four weeks rather than a calendar month.

(b)    NHTC may elect to extend the term of this Agreement for an additional three months, during which NHTC may select any MVCG employee or combination of employees to provide an aggregate of 166 hours per month (provided Cavanaugh and Landry may each limit their NHTC related work hours to 30/week). If NHTC elects to extend this Agreement under this provision, then NHTC will pay MVCG the following during the extended term of this Agreement (with such amounts billed on a bi-weekly basis):

   i.   If agreed to in a writing received by MVCG prior to the signing of this Agreement, months 7-9 will be billed at a flat $25,000 per month;

  ii.   If elected in a writing received by MVCG during months 1-4, months 7-9 will be billed at a flat $30,000 per month; and

 iii.   If not elected in a writing received by MVCG, MVCG may, at its option, provide continued consulting services at a rate of $200 per hours with a minimum commitment of 100 hours per month (with this option, MVCG's scheduling commitments may not allow it to provide services in a timely manner).

     9.    <u>Nonpayment and Termination by MVCG</u>:  If the payments or performance due by MVCC or NHTC to MVCG (whether under this Agreement or the Going-Forward Agreement) are not timely made, MVCG may suspend performance of services until payment of all amounts due are made in full. MVCC shall pay MVCG interest on the payments not timely made hereunder at a rate equal to 1.5% per month (or the highest rate permissible by law if less) together with all costs and expenses (including reasonable attorney's fees) incurred to collect such amounts.  MVCG may terminate this Agreement for Cause if NHTC fails to make any payment when due hereunder, or if NHTC or MVCC fail to timely pay or perform any of their obligations to MVCG (whether under this Agreement or the Going-Forward Agreement), and such failure continues for ten (10) days after receipt of written notice of such failure from MVCG.  If all overdue amounts due to MVCG under this Agreement are not paid within ten (10) days after a written request from MVCG, MVCG shall be entitled to terminate its obligation to provide consulting services hereunder.  If this Agreement is terminated early due to a breach by NHTC or MVCC (including, without limitation, under Section 10 below), then NHTC and MVCC shall immediately owe and pay MVCG the remaining amount which was to be payable during the full term.

    10.    <u>Termination For Cause</u>.  Subject to a payment default being covered by Section 9 above, either NHTC/MVCC or MVCG may terminate this Transition Services Agreement for Cause if the other breaches its obligations hereunder and fails to diligently pursue curing the breach after receipt of a written notice from the non-breaching party which specifically identifies the breach.  The unavailability of Cavanaugh or Landry due to unavoidable circumstances (e.g., death or disability) shall not be deemed a breach of this Agreement.

    11.  <u>Confidentiality</u>.

     (a)    During the term of this Agreement and in the course of MVCG's performance of services for NHTC, MVCG may receive and otherwise be exposed to confidential or competitively sensitive information of NHTC, or of a third party with which NHTC has a business relationship, relating to NHTC's or such third party's current or prospective business, research and development activities, products, technology, strategy, organization and/or finances (collectively, "Confidential Information").  Such Confidential Information, which may be disclosed orally or in writing, shall include, without limitation, plans, strategies, negotiations, customer or prospect identities, market analyses, projections, forecasts, cost and performance data, sales data, financial statements, price lists, pre-release information regarding NHTC's products, personnel lists and data, and all documents and other materials (including any notes, drawings, reports, manuals, notebooks, summaries, extracts or analyses), whether in written or electronic form, that disclose or embody such Confidential Information.

     (b)    Confidential Information shall not include information that is now, or hereafter becomes, through no act or failure to act MVCG's part, generally known to the public; information that was rightfully in MVCG's  possession without confidentiality restriction prior to NHTC's disclosure to MVCG; information that was rightfully obtained

by MVCG from a third party who has the right, without obligation to NHTC, to transfer or disclose such information; information MVCG develops without use of the Confidential Information; or information which MVCG is required to disclose pursuant to judicial order, provided that in the latter case MVCG shall promptly notify NHTC and provide reasonable assistance to NHTC, at NHTC's expense, to protect NHTC's rights prior to disclosure. At all times, both during MVCG's relationship with NHTC and after the termination thereof, MVCG will keep all Confidential Information in strict confidence; will not use Confidential Information except for the purpose of providing services to NHTC; and will not divulge, publish, disclose or communicate Confidential Information, in whole or in part, to any third party. MVCG further agrees that MVCG will not allow any unauthorized person access to Confidential Information, either before or after the termination of this Agreement, and will take all action reasonably necessary to protect the confidentiality of Confidential Information. MVCG agrees not to reproduce or copy by any means Confidential Information, except as reasonably required to accomplish the purposes of this Agreement, and further agrees not to remove any proprietary rights legend from such Confidential Information or copies thereof made in accordance with this Agreement. MVCG will not erase, discard or destroy any tangible or electronic materials that disclose or embody Confidential Information without specific instructions from NHTC to do so.

(c)     Upon termination of MVCG's services for any reason, or upon demand by NHTC at any time, MVCG's right to use Confidential Information shall immediately terminate, and MVCG shall return promptly to NHTC, or destroy, at NHTC's option, all tangible and electronic materials that disclose or embody Confidential Information.

(d)     Notwithstanding anything to the contrary in the foregoing, MVCG, Cavanaugh and Landry may retain and use a copy of information and materials necessary or useful in the operation of the Software delivered to MVCG under Section 2.3 of the Going-Forward Agreement dated of even date herewith to which the parties hereto are also parties and contact information for the purpose of proposing, offering and providing computer-programming or application server provider services to any person and for maintaining personal relationships, but will otherwise hold contact information which is Confidential Information (as defined in the Non-Competition Agreement) in confidence, not disclose it to any person other than MVCG employees who need and use it to propose, offer or provide services, and will not use it to directly or indirectly recruit or solicit any employees, distributors or vendors of NHTC for any other person.

(e)     For clarity and avoidance of doubt, notwithstanding anything to the contrary in this Agreement but without limiting the scope of Section 12 below, the foregoing restriction applicable to Confidential Information is not applicable to and does not restrict use of service providers and advisors (e.g., financial services, compliance and fiscal advisors, network services, logistics, etc.) who are known as a result of the use or prospecting of such parties by NHTC/MVCC.

12.     <u>Nonsolicitation of Customers and Distributors</u>.  During the term of this Transition Services Agreement and for one (1) year thereafter (the "Nonsolicitation Period"), each of Cavanaugh and Landry separately agrees that he will not, in any capacity, directly or indirectly:

      (a)     solicit business or patronage of any customer or prospective customer (collectively, "Customer"), or distributor or prospective distributor (collectively, "Distributor") of NHTC in connection with any Competitive Activity;

      (b)     divert, entice, or otherwise take away from NHTC the business or patronage of any Customer or Distributor, or attempt to do so;

      (c)     solicit, induce or assist any Customer, Distributor or supplier to terminate or reduce its relationship with NHTC; or

      (d)     refer a Customer or Distributor of NHTC to another person engaged (or to be engaged) in Competitive Activities.

The foregoing is not intended to prohibit, and shall not prohibit, Cavanaugh, Landry or MVCG from providing software, computer programming, application provider services and other consulting services to any multi-level marketing business that directly or indirectly competes with NHTC in recruiting for independent distributors.

"Competitive Activities" means the distribution of goods or services through independent distributors but does not include providing software, computer programming, application provider services and other consulting services to any multi-level marketing business that directly or indirectly competes with NHTC in recruiting for independent distributors.

     13.    Nonsolicitation of Employees.   During the Nonsolicitation Period, each of Cavanaugh and Landry separately agrees that he will not, except as expressly permitted below:

      (a)     hire or employ, directly or indirectly through any enterprise with which he is associated, any current employee of NHTC or any individual who had been employed by NHTC within one (1) year preceding the date of this Agreement (other than persons whose employment by NHTC was terminated by or at the request of NHTC); or

      (b)     recruit, solicit or induce (or in any way assist another person or enterprise in recruiting, soliciting or inducing) any employee or director of NHTC to terminate his or her employment or other relationship with NHTC.

Notwithstanding the foregoing, Cavanaugh, Landry and MVCG are not prohibited from at any time recruiting or hiring current MVCC employees (*i.e.*, employees of MVCC as the date of this Agreement) to work for MVCG; subject, however, to Section 5 above. During the Nonsolicition Period, NHTC and MVCC agree not to directly or indirectly (i) recruit solicit or induce (or in any way assist or encourage another person or enterprise to recruit, solicit or induce) any employee or service provider of MVCG to terminate or diminish his or her employment or other relationship with MVCG, or (ii) hire or otherwise retain a then current or former MVCG employee that has provided services to NHTC/MVCC under this Agreement.

     14.    Acknowledgments.  Each of Cavanaugh and Landry separately acknowledges and agrees that the restrictions set forth in Sections 12 and 13 of this Agreement are intended to protect NHTC's reasonable competitive business interests, NHTC's interest in Confidential Information (provided either under this Agreement or under any previous employment agreement with NHTC) and NHTC's commercial relationships and goodwill (with its Customers, Distributors, vendors, directors and employees), and are reasonable and appropriate for these purposes.

15.   Injunction.  Each of Cavanaugh and Landry separately acknowledges and agrees that it would be difficult to measure any damages caused to NHTC which might result from any breach by Cavanaugh or Landry, as the case may be, of the promises set forth in Sections 12 and 13 of this Agreement, and that in any event money damages would be an inadequate remedy for any such breach.  Accordingly, each of Cavanaugh and Landry separately agrees that if he breaches, or proposes to breach, any portion of this Agreement, NHTC shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach without showing or proving any actual damage to NHTC.

16.   Enforceability.  If any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.  In the event that any provision of this Agreement is determined by any court of competent jurisdiction to be unenforceable by reason of excessive scope as to geographic, temporal or functional coverage, such provision will be deemed to extend only over the maximum geographic, temporal and functional scope as to which it may be enforceable.

17.   General Provisions.  No purported amendment, modification or waiver of any provision hereof shall be binding unless set forth in a writing signed by both parties (in the case of amendments and modifications) or by the party to be charged thereby (in the case of waivers).  Any waiver shall be limited to the circumstance or event specifically referenced in the written waiver document and shall not be deemed a waiver of any other term of this Agreement or of the same circumstance or event upon any recurrence thereof.  The parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  This Agreement shall be governed by and construed in accordance with the law of the State of Delaware without regard to the conflicts of laws and rules thereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement constitutes the entire Agreement between the parties and supersedes any and all prior and contemporaneous oral or written understandings between the parties relating to the subject matter hereof.  Copies of this Agreement with signatures transmitted electronically (e.g., by facsimile or pdf) shall be deemed to be original signed versions of this Agreement.  Upon execution of both this Agreement and the Going-Forward Agreement, except as expressly stated to the contrary, this Agreement shall be a separate and distinct from the Going-Forward Agreement.

18.   Equipment.  NHTC/MVCC represent and warrant that they own the items identified on **Appendix A.** NHTC/MVCC hereby sell the items identified on **Appendix A** to MVCG provided if NHTC/MVCC terminate this Agreement under Section 10 above then MVCG shall sell such items back to NHTC/MVCC.  The initial sale, and (if applicable) the sale-back, shall be a sale of good title to such items, free and clear of all liens and encumbrances on an "AS IS, WHERE IS" basis for $1.00.

19.   Enforcement.  In any action (at law or in equity) instituted to enforce or interpret the terms of this Agreement, the prevailing party (i.e., the party whose position is substantially upheld) shall be entitled to recover from the non-prevailing party all fees, costs and expenses of the prevailing party incurred with respect to such action, including but not limited to, fees, costs and expenses of attorneys, which shall include, without limitation, all fees, costs and expenses of appeals.  Further, the parties agree that any action to enforce or interpret the terms of this

Agreement shall be exclusively resolved in state or federal court within Hennepin County, Minnesota, and each party consents to personal jurisdiction in such courts and waives any argument that the venue is not convenient.

*[Signature page follows]*

The parties hereto have caused this Transition Agreement to be effective as of *Dec. 1*, 2008.

NATURAL HEALTH TRENDS CORP.          MARKET VISION COMMUNICATIONS CORP.

By _____          By _____
Its _____President_____           Its _____Director_____
Print Name _Chris Sharng_           Print Name _Chris Sharng_

MARKETVISION CONSULTING
GROUP, LLC

By _____
      John Cavanaugh, CEO

[SIGNATURE PAGE TO GOING-FORWARD AGREEMENT]

4422026

**Appendix A**

**Furniture**

| | |
|---|---|
| Office Chair | 7 Black, Adjustable, Mesh, swivel roller |
| Office Chair | 10 Green, stationary, black metal legs |
| Office Chair | 2 Flower print, reception area |
| Office Chair | 2 Green, stationary, wood legs |
| Office Chair | 6 Black, executive, swivel, conference room |
| Office Chair | 3 Blue, swivel, misc. |
| Office Chair | 2 Purple and blue, stationary, wood legs |
| Magazine Table | 1 Wood, reception area |
| Modular Office Desk | 5 Desk System with upper cabinet and tuck under two and three drawer cabinets |
| Modular Office Desk | 1 Desk system with two drawer tuck under |
| Modular Office Desk | 2 Wall mounted desk / table |
| Book Case | 2 Large, wooden, adjustable shelves |
| Table | 1 Small, round |
| Conference Table | 1 Small, oval, wooden |
| Conference Table | 1 Large, wooden, oval |
| Cabinet | 1 Wall mounted |
| Water Cooler | 1 PUR water cooler |
| Books | 22 Misc. software and programming related books |
| Cabinet | 1 Free standing, 2 door, office supply cabinet |
| Cabinet | 1 3 Drawer, hanging file, free standing |
| Office Supplies | Miscellaneous office supplies |

**Equipment**

| Brand | Model | QTY | Notes |
|---|---|---|---|
| Dell | Dim 8400 | 4 | |
| Dell | Dim 9100 | 1 | |
| Dell | E510 | 2 | |
| Dell | Dim 9200 | 4 | |
| Dell | Pntr-5100cn | | Printer |
| Dell | PE500SC | | M0n0wall |
| Dell | PESC1425 | | WebDev |
| Dell | PC3424 | | Power Connect Switch |
| Dell | 16 Port Switch | 1 | |
| Dell | 720 Printer | 2 | Desktop Printers (low end) |
| HP | Laser Jet 3330 | 1 | Copy / Fax / Printer |
| HP | Vectra | 1 | Old Desktop |
| HP | 8 Port Console Switch | 1 | KVM Switch |
| HP | Procurve Switch 24 port | 1 | Switch in basement for network |
| Unknown | Unknown | 1 | Old Desktop |
| Apple | MacMini | 1 | |
| Compaq | Proliant ML 380 | 1 | RackMount |
| Matrix | UPS 5000 | 1 | Battery backup (control unit and battery unit) |
| ReadyNas | | 1 | Backup |
| Server | Built In-House | 1 | Server (MBP) |
| APC | AP9606 | 1 | Web / SNMP Management Card (web connect to manage APC Power Cor |
| APC | Power Controller | 1 | Power manager for servers |
| APC | 1000 XS | 2 | Battery backup |
| APC | 500 ES | 5 | Desktop battery backup and surge protector |

**Appendix A (continued on next page)**

4422026

**APPPENDIX A (continued)**

| Unknown | Postal Scale | 1 | Small postal scale used for testing |
| Unknown | AC Unit | 1 | Portable AC unit used in server room |
| Misc | Monitors | 20 | 18 Dell Flat panel (15inch) 2 various flat panel monitors |
| InFocus | Projector | 2 | 1 Works 1 Does not |
| Logitech | WebCam | 4 | |
| Conext | | 4 | Desktop battery backup and surge protector |
| Unknown | Unknown | 3 | Black Computer equip. mounting racks |